IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR SUSSEX COUNTY

BARN HILL PRESERVE OF          :
DELAWARE, LLC, A DELAWARE      :
LIMITED LIABILITY COMPANY,     :
                               :
                               :
        Petitioner,            :
                               :
                               :   C.A. No. S18A-10-002 RFS
v.                             :
                               :
                               :
THE BOARD OF ADJUSTMENT OF     :
THE TOWN OF OCEAN VIEW,        :
DELAWARE,                      :
                               :
        Respondent.            :

**MEMORANDUM OPINION**

Date Submitted: February 15, 2019
Date Decided: May 29, 2019

*Upon Appeal from a Decision of the Board of Adjustment of the Town of Ocean View.*
*Affirmed.*

Brian J. McLaughlin, Esq., Mozack Mersky McLaughlin Browder, P.A., 1201 N. Orange Street, Suite 400, Wilmington, Delaware 19801, Attorney for Petitioner.

Dennis L. Schrader, Esq., and Eric R. Hacker, Esq., Morris James LLP, 107 W. Market Street, Georgetown, Delaware 19947, Attorneys for Respondent.

**STOKES, R. J.**

## I. INTRODUCTION

Presently before the Court is an appeal from a decision of the Board of Adjustment of the Town of Ocean View ("BOA" or "Board") brought by Barn Hill Preserve of Delaware, LLC ("Petitioner" or "Barn Hill"). Petitioner seeks to reverse the BOA's decision that Petitioner's application has not met the requirements needed to establish a special exception to construct and operate a Wildlife Educational Center. The Court AFFRIMS the decision of the BOA for the reasons discussed below.

## II. FACTS

On March 15, 2018, Barn Hill filed an application for a special exception in order to operate a Wildlife Educational Center at the property in dispute. On May 17, 2018, the BOA held a hearing on Barn Hill's application for a special exception. Only four of the five Board members were present for the initial hearing. At the initial hearing the BOA voted to defer an opinion on the application until the next regularly scheduled meeting. On July 19, 2018, the Board voted 4-0 to deny Barn Hill's application. Finally, on September 20, 2018, the BOA issued a written decision on the matter.

Barn Hill is a wildlife education and conservation organization devoted to conservation education. Its mission is to educate and cultivate an appreciation for wildlife to help in the protection of thousands of species of wildlife threatened with extinction. Barn Hill began its animal education program in Louisiana in 2013 and has expanded into Delaware with a Mobile Education Program, which travels to schools throughout the region to educate students on wildlife conservation. Barn Hill sought to operate a brick and mortar wildlife educational center in Ocean View, Delaware, which is the dispute of this litigation.

1

The property is located in the GB-1 (*General Business District 1*) area of the Town of Ocean View ("Town" or "Ocean View"). The Land Use and Development Code of the Town of Ocean View ("LUDC") specifically permits Wildlife Educational Centers in this area with the granting of a special exception by the BOA.[1] The property is an "L" shaped parcel totaling 4.06 acres of land located in Ocean View's commercial district. It is bordered on the east by a commercial retail store, Wild about Birds, and is bordered on the west by a commercial complex which includes restaurants and various retail stores. The property sits on Delaware Route 26, the main thoroughfare through the Town. Across Route 26 is the entrance to a large residential community containing approximately 200 homes. The northern side of the property is currently a wooded area lined with trees zoned R-1 Single-Family Residential and is the subject of a pending residential subdivision application.

At the initial BOA hearing a Town official stated that Town Council has approved a Wildlife Educational Center as a permissible use with granting a special exception and outlined the seven criteria that Barn Hill would have to address in order for the BOA to grant a special exception.[2] Thereafter, Barn Hill made a presentation to the BOA concerning the application for a special use exception. First, Barn Hill discussed the goal of the company, which is wildlife and conservation

---

[1] Article XVIII, §140-24 of the Land Use and Development Code of the Town of Ocean View ("LUDC").
[2] LUDC §140-116:

The Board of adjustment shall determine whether each special exception application meets the following conditions:

    A.   Is in harmony with the purpose and intent of the Comprehensive Plan;
    B.   Will be in harmony with the general character of it neighborhood considering density, design, bulk, and scale of proposed new structures;
    C.   Will not be detrimental to the use, peaceful enjoyment, economic value, or development of surrounding properties;
    D.   Will not cause objectionable noise, vibrations, fumes, odors, dust, glare, or physical activity;
    E.   Will have no detrimental effect on vehicular or pedestrian traffic;
    F.   Will not adversely affect the health, safety, security, or general welfare of residents, visitors, or workers in the area; and
    G.   Complies with all other applicable standards, laws, and regulations in addition to the provisions of this chapter.

education. Barn Hill then went on to describe the Barn Hill Louisiana facility, how students have been educated by Barn Hill, and how they will plant flowers at the Delaware facility. In operating the Delaware Wildlife Educational Center Barn Hill plans to charge $30-50 for admission. Groups of 10-15 people will be present at the facility for periods of time between one and two hours during the summer and fall months. The facility will be closed during the winter. All visitors must make appointments through an online reservation system and there will be twenty-two parking spaces on the grounds.

Barn Hill then discussed the types of animals that would be housed at the Delaware facility. The largest animal to be housed at the facility is a juvenile kangaroo or Eurasian Lynx, which can grow to the size of a medium dog (40-50 pounds). Barn Hill also supplied the board with an animal educational packet, which gave a detailed description of nine species of animals that were to be housed at the facility. All animals were planned to be housed outdoors in a paddock area in cages with double door entry and the outside of the facility will have a perimeter fence conforming with the Town Code. The education packet lists nine different species of animals, including the Eurasian Lynx, Asian Small-clawed Otters, Sulcata Tortoise, Patagonian Cavies, Linnaeus Two-toed Sloth, Tayra (a type of weasel), Common Parakeet, Red Kangaroo and Bennet's Wallaby.

Next, the BOA questioned Barn Hill about how waste from the animals would be taken care of or disposed. Barn Hill explained that solid waste would be removed from the facility daily, concrete surfaces would be scrubbed, and diatomaceous earth and different soil disinfectants could be used if smells were a problem. Furthermore, an employee from Barn Hill stated, "I don't anticipate any of these animals being large enough to cause real problems, as long as daily waste removal is completed." Barn Hill planned to have solid animal waste disposed of offsite, and outside of Town limits, by a professional waste removal company. Barn Hill also addressed noise

3

concerns from the animals. Specifically, Barn Hill stated, animals at the facility either do not vocalize at all or they do not vocalize loud enough to be heard from a distance of more than 10 feet. Moreover, Barn Hill plans on planting aesthetically pleasing hedges as sound buffers around the perimeter fencing.

After Barn Hill completed its presentation the BOA invited any persons present who wished to speak in favor or against Barn Hill's application. No one spoke in favor of Barn Hill and several people spoke against the application. First, the president and homeowners of the residential neighborhood across Route 26 spoke against the granting of the special exception application. He submitted a packet of emails voicing concerns about the Barn Hill application. In his testimony he voiced many of the concerns from said emails. The concerns of the homeowners in the residential neighborhood include waste, waste odors, and increased traffic congestion. Specifically, the ability to contain waste runoff during rainstorms, the number of animals to be housed at the facility, and odor from urine were concerns for the homeowners. The homeowners also expressed concerns about the possibility that the facility would negatively affect property values. In regard to traffic considerations the homeowners expressed concerns about too much congestion on Route 26 during the summer months, people curiously stopping to see what the new attraction is, and a lack of a traffic light at the entrance of the facility, and school busses coming to the property. Next, a business owner objected to the application. She voiced many of the same concerns as the homeowners.

The BOA gave Barn Hill a chance to respond to the comments in opposition of the special use application. Barn Hill, in response to traffic concerns, confirmed that there would be no school busses coming to the facility. Barn Hill also stated that there will be twenty-two parking spaces and that the fifteen person groups for two hour periods will not affect traffic any more than it is

4

already impacted by existing locations surrounding the property. Concerning the runoff from waste Barn Hill proposes that they will have a catch pond present on the property so that all runoff would be captured by a catch pond and would not go into any other source of water or property.

After all sides had been heard the BOA voted to defer making a decision until the next regularly scheduled meeting of the BOA. After reviewing all documents submitted by Barn Hill, and those in opposition to the special exception application, the BOA unanimously denied the application. In the BOA's written decision it determined that the Wildlife Educational Center would fit under the definition in LUDC as an education center and not a zoo. However, the BOA denied the special exception because (1) the application is not in harmony with the purpose of the Comprehensive Plan, (2) the application is not in harmony with the general character of its neighborhood, (3) it is unlikely that the applicants can control all noise and odors coming from the center without interfering with the peaceful enjoyment or economic values of surrounding properties, and (4) the proposed center will have a detrimental effect on traffic.

## III. STANDARD OF REVIEW

The standard of review for appeals from a Board of Adjustment decision is limited to the correction of errors of law and determination of whether substantial evidence exists in the record to support the Board's findings of fact and conclusions of law.[3] Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[4] If the Board's decision is supported by substantial evidence, a reviewing court must sustain the Board's decision even if such a court would have decided the case differently if it had come before it in the

---

[3] *Janaman v. New Castle County Bd. Of Adjustment*, 364 A. 2d 1241, 1241 (Del. Super. Ct. 1976).
[4] *Miller v. Bd. Of Adjustment of Dewey Beach*, 1994 WL 89022, at *2 (Del Super. Ct. Feb 16, 1994).

first instance.[5] "The burden of persuasion is on the party seeking to overturn a decision of the Board to show that the decision was arbitrary and unreasonable."[6] Questions of law are reviewed *de novo*.[7] In its appellate review, the Superior Court after examining the record may "reverse or affirm, wholly or partly, or may modify the decision brought up for review."[8]

## IV. DISCUSSION

*A. The Application is in Harmony with the Comprehensive Plan because Town Council Specifically Approved the Disputed Area as an Appropriate Area for a Wildlife Educational Center.*

The BOA erred in holding that the Application was not in harmony with the Comprehensive Plan. The Compressive Plan must be read in conjunction with prior land use legislation of the Town's legislative body. One of the goals of the Comprehensive Plan is to encourage commercial development to promote and encourage existing businesses, the promotion of restaurants, retail stores, small retail shops, professional and medical offices and recreational uses that provide needed goods, services and jobs to the Town, but not large-scale, regional retail uses.[9] The Comprehensive Plan also encourages the use of special exceptions in land use regulations and seeks to encourage flexibility to support business opportunities, encourage businesses and expand the commercial uses within the business area.[10] Furthermore, the Comprehensive Plan seeks to promote wildlife and natural vegetation education.[11] Specifically, a goal is to educate the public on the effects of pollution on the environment and health of wildlife and wildlife habitat.[12]

---

[5] *Mellow v. Bd. Of Adjustment of New Castle County*, 565 A. 2d 947, 954 (Del. Super. Ct. 1988), *aff'd*, 567 A. 2d 422 (Del. 1989).
[6] *Id.* at 956.
[7] *Teckstrom, Inc. v. Savla*, 2006 WL 2338050, at *4 (Del. Super. Ct. 2006).
[8] 22 *Del. C.* § 328(c).
[9] Town of Ocean View Comprehensive Plan, at 19-23 (Adopted July 13, 2010).
[10] *Id.* at 48
[11] *Id.* at 53
[12] *Id.* at 59-63.

Town Council passed an ordinance specifically adding Wildlife Educational Centers as a permissible use in the GB-1 and GB-2 commercial zoning districts, the same district in which the Property sits, with the granting of a special exception.[13] The Town's Planning Commission reviewed the ordinance and recommended, by a 4-0 vote, its adoption by Town Council. Ultimately, Town Council approved the ordinance. In approving the ordinance Town Council necessarily reviewed the relationship of the proposed ordinance to the general purpose and intent of LUDC and the Comprehensive Plan.[14] The Municipal Code expressly notes that LUDC was "made in accordance with the Comprehensive Plan", and that all of the regulations contained in the LUDC were "made with reasonable consideration of the following", (1) the character of each district and its peculiar suitability for a particular use, (2) conserving the value of buildings, and (3) encouraging the most appropriate use of land throughout the Town of Ocean View.[15]

However, the BOA argues that Barn Hill has not shown that the proposed use conforms to the Town's Comprehensive Plan. The BOA argues that none of Barn Hill's arguments were presented to the BOA at the hearing, and because of this Barn Hill failed to meet its burden to present information on this factor to the BOA. The BOA asserts that under LUDC, the applicant has the burden to show that the use complies with the Town's Comprehensive Plan. But, the BOA believes that Barn Hill has attempted to flip this burden onto the BOA to create a record that a proposed use is not in conformity with the Comprehensive Plan. The BOA's argument is incorrect and Barn Hill has not attempted to flip its burden.

---

[13] An Ordinance Amending the Ocean View Land Use and Development Code by Adding Wildlife Educational Centers as Special Exceptions in GB-1 and GB-2 General Business Districts, Ord. 342 (adopted September 12, 2017).
[14] LUDC, Article XIX § 140-137
[15] LUDC, Article I § 140-3(B).

7

The standard laid out by the LUDC § 140-111 is as follows, "[e]very applicant shall have the burden of presenting the information needed by the Board of Adjustment to make a special exception determination." Here, Barn Hill, in its application, provided the BOA with the Comprehensive Plan, the LUDC, and that the center was to be operated as a Wildlife Education Center. This information was the only information the BOA needed in order to determine that the Wildlife Educational Center was in harmony with the Comprehensive Plan. By approving a Wildlife Educational Center as a permissible use with the granting of a special exception, the legislative body of the Town determined that such use, and the placement of such use in the Town's commercial districts, conform to the Comprehensive Plan. Furthermore, the goals of Barn Hill are similar to the goals of the Comprehensive Plan, in that Barn Hill's mission is to educate the public and cultivate an appreciation for wildlife stewardship and to help protect the environment.

Based on the above facts, a reasonable mind could not accept as an adequate conclusion that a Wildlife Educational Center is not in harmony with the purposes and intent of the Comprehensive Plan. However, Barn Hill needed to present evidence to satisfy all seven requirements of LUDC §140-116 in order for the BOA to approve a grant for a special exception. As discussed below Barn Hill has failed to meet this burden and the BOA's decision should be upheld.

*B. The Board Relied on Substantial Evidence to Conclude that Barn Hill's Wildlife Educational Center Will Cause Objectionable Odor or Noise.*

Through the testimony at the hearing and documentary evidence, presented by Barn Hill, the BOA relied on substantial evidence to conclude that the Wildlife Educational Center as proposed will cause objectionable noise or odor. LUDC section 140-116(D) requires that Barn Hill present the BOA with evidence to determine that the Wildlife Educational Center will not cause objectionable noise, vibrations, fumes, odors, dust, glare, or physical activity. If the BOA's

8

decision is supported by substantial evidence, a reviewing court must sustain the Board's decision even if such a court would have decided the case differently if it had come before it in the first instance.[16] Once the BOA has made a factual determination "[t]he burden of persuasion is on the party seeking to overturn a decision of the BOA to show that the decision was arbitrary and unreasonable."[17] In order for a decision to be arbitrary and unreasonable, a decision must be the product of an unreasoned, irrational or unfair process.[18] Here, the BOA has made the factual determination that the Wildlife Educational Center as proposed will cause objectionable noise or odor and Barn Hill cannot meet the high burden to prove that the decision was arbitrary and unreasonable.

The BOA was presented with a large amount of evidence concerning the odor or noise that would be emitted from the Wildlife Educational Center. First, the BOA heard testimony from the owners/operators of the Wildlife Educational Center, who have degrees in Animal Science and Natural Resources Ecology & Management. They testified that the animals that they plan to house at the property are low waste-producing animals. Specifically, the owners stated, "in my professional opinion, I don't anticipate any of these animals being large enough to cause real problems, as long as daily waste removal is completed."[19] The owners then went on to describe how animal waste would be handled by the facility. The owners testified that animal feeding bowls would be removed twice per day, that feeding bowls are scrubbed with soap and bleach, almost one hundred percent of waste when possible is removed, enclosures are spot cleaned, concrete is scrubbed, and diatomaceous earth and different soil disinfectants are used if needed if smells were

[16] *Mellow*, 565 A. 2d 947, at 954 (Del. Super. Ct. 1988).
[17] *Id.* at 956.
[18] *Save Our Cty. Inc. v. New Castle Cty.*, 2013 WL 2664187, at *9 (Del. Ch. 2013).
[19] Hearing Tr. 13:5-9, May 17, 2018.

a problem.[20] Furthermore, the owners testified that all solid waste is disposed of offsite and outside of the Town limits. Finally, the owners testified that the animals to be housed at the facility do not vocalize, or do not vocalize loud enough to be heard from more than 10 feet away.[21]

After the owners were heard at the hearing the BOA opened up the floor for those in opposition to the application to present testimony and evidence. No one spoke in favor of the application, and several residents spoke in opposition to the application. Some of the concerns brought up by those in opposition to the application were waste runoff during rain storms, how many animals would be housed in each enclosure, what animals would be housed at the property, and odor from animal urine. Specifically, one person who objected to the application stated that she ran a small farm and knows that you cannot get rid of the smell of urine. After the opponents to the application voiced their concerns the BOA gave Barn Hill an opportunity to respond. Barn Hill responded that they will have a catch pond on the property to capture any waste runoff caused by rain, so that the waste will not make it into any other source of water.[22] During this time Barn Hill also addressed traffic concerns, the safety of animals, and their treatment of animals. However, Barn Hill did not go further into detail about odor concerns and simply pointed to their animal education packet to answer what kind of animals would be at the Wildlife Educational Center.

The animal education packet provided by Barn Hill gives extensive descriptions about the animals that will be housed at the property. The packet lists the animals, gives a general overview of each animal, explains diet, describes the enclosure, and discusses maintenance of each type of animal. The packet points out nine distinct animals that Barn Hill plans on housing at the facility. However, neither the animal education packet provided by Barn Hill nor the testimony before the

---

[20] *Id.*
[21] *Id.* at 24:17-24.
[22] *Id.* at 62:15-22

BOA describes specifically how many of each individual type of animal will be housed at the property in each enclosure. But, Barn Hill's animal education packet does describe several of the animals to be housed at the facility to be "scent marking" animals. The animals that are listed as scent marking animals include the Tayra, Eurasian Lynx, and Asian Small-clawed Otter. The packet specifically describes the maintenance of these particular scent marking animal's enclosures. In order to maintain the enclosures, and keep these scent marking animals comfortable, Barn Hill cleans one quarter of the enclosure daily in order to still leave scent marks on the remaining sections. The animal education packet provided by Barn Hill also states that it will clean these specific animal's enclosure furnishings sparingly, as needed, in order to avoid any stress [to the animals].

After considering all of the evidence presented to the BOA at the hearing and the animal education packet presented by Barn Hill a reasonable person could conclude that the Wildlife Educational Center as proposed would cause objectionable odor. This Court only needs to find that the BOA relied on substantial evidence in making its determination. Considering that the animals are to be housed outside, the number of total animals is uncertain, and several of the animals are scent marking, a reasonable person could find that odors from urine and other animal waste would produce objectionable odors to neighboring property owners, even though the animals are considered "small", "low waste producing" and Barn Hill provides cleaning and maintenance. Furthermore, LUDC section 140-42.3(B)(1) states, "[t]o the extent feasible, the use (a Wildlife Educational Center) shall be conducted within a completely closed building." Therefore, one way that Barn Hill could avoid the potential odor concern would be to move the animals into an entirely enclosed building, as LUDC suggests.

11

Next, Barn Hill argues that the BOA did not apply the correct standard because the BOA used the language, "it is unlikely that applicants can control *all* noise and odors coming from the center." Barn Hill continues that they do not have the burden to prove that the proposed use will generate no noise or odor, but rather that the proposed use will not cause objectionable noise or odor. However, in reviewing the BOA's decision the correct legal standard to apply is not whether the Board's decision contains mistakes, but rather this Court must determine whether substantial evidence exists on the record to support the Board's decision.[23] In other words, the decision may be upheld unless it is clearly shown that after, accounting for actual mistakes of fact, substantial evidence no longer exists.[24] Also, the BOA need not follow a particular roadmap when reciting the grounds for its decision and perfection is neither expected nor required.[25] It is enough that [the BOA] states its reasons with sufficient clarity that the court is not left to guess why the decision was made and is able to make the requisite determination that the decision was not the product of arbitrary or capricious reasoning.[26]

Here, as described above, the BOA certainly relied on substantial evidence to determine that the proposed use would cause objectionable noise or odor. Just because the written decision substitutes the word words "all noise and odor" in place of the phrase "objectionable noise and odor" does not undermine the determination of the BOA that the proposed use would cause objectionable noise or odor. Furthermore, it is clear that the BOA understands that the legal standard to apply to the application is whether the proposed use will cause objectionable noise or odor, as the BOA clearly stated this standard several times during the hearing.

---

[23] *Protecting Our Indian River v. Delaware Department of Natural Resources and Environmental Control*, 2015 WL 5461204, at *11 (Del. Super. Ct. 2015).
[24] *Davis v. Mark IV Transportation*, 2011 WL 6392950, at *3 (Del. 2011).
[25] *New Castle Cty. Council v. BC Dev. Assocs.*, 567 A. 2d 1271, 1276-77 (Del. 1989).
[26] *TD Rehoboth LLC v. Sussex Cty. Council*, 2017 WL 3528391, at *7 (Del. Ch. 2017).

12

*C. Applicants Failed to Present Testimony or Evidence that Traffic Would Not Be Detrimentally Effected by Barn Hill's Wildlife Educational Facility.*

The BOA's decision must also be upheld because Barn Hill failed to provide testimony or evidence for the BOA to determine whether or not traffic would be detrimentally effected by the proposed use. As stated above Barn Hill had the burden of producing evidence sufficient for the BOA to make a determination on all seven requirements mentioned in the LUDC. Presently, Barn Hill has failed to produce evidence sufficient for the BOA to make a determination about whether the proposed use will have a detrimental effect on traffic. The only evidence that Barn Hill has provided concerning traffic is the size of their parking lot, the amount of people Barn Hill assumes will attend each tour, and the approximate length of each tour. This evidence gives little to no information to the BOA about the proposed uses' effect on traffic.

On the other hand, opponents to the application raise various concerns about the traffic that the proposed use would cause along Route 26. Opponents state that Barn Hill has a 22-car parking lot, that they are going to have school buses, that the business will be operating during the summer when traffic is at its highest point, and there is no traffic signal at the intersection where the property sits. The opponents contend that all of these factors will lead to a detrimental impact on traffic if the facility becomes operational. After Barn Hill heard opponent's concerns they had the opportunity to address the traffic issues. First, Barn Hill stated that no buses would be coming to the facility because Barn Hill went to schools and schools were not going to come to Barn Hill. Next, Barn Hill contends that they only have 22 parking spots with hour long tours, so the number of people pulling in and out will not be large. However, Barn Hill also stated that in the beginning they were hoping for more people to be able to visit the facility at a time, but the limited parking cut this number down.

13

Barn Hill did not provide enough evidence for the BOA to make a determination about traffic concerns. Barn Hill merely stated their business plan and the amount of parking spaces available. The information provided is simply not enough for the BOA to make a determination that the proposed use will not have a detrimental effect on traffic. However, Barn Hill argues that this case should be analogized to *Gibson v. Sussex County Council*, where the court held that vague and unsupported traffic congestion concerns were not adequate grounds to deny an application for a conditional use.[27] But this case is distinguishable because the Zoning Commission in *Gibson* had already expressly found that the proposed conditional use will have no significant impact upon traffic.[28] Here, the special exception was not expressly found to have no significant impact on traffic.

Finally, Barn Hill argues that this application would produce no more traffic than the traffic already produced by various other locations on Route 26. Barn Hill mentions a recently approved miniature golf course along Route 26 in this argument. This Court cannot consider and compare the traffic volume produced by these other businesses as Barn Hill has not provided the BOA or this Court with information necessary to make those comparisons. Barn Hill has not provided the application from these other properties nor the BOA's written decisions from these applications.

Therefore, considering the lack of information presented to the BOA regarding the proposed uses effect on traffic Barn Hill has failed to meet its burden of providing information sufficient for the BOA to make a determination on the effect of traffic. In order to meet its burden Barn Hill could have produced evidence such as a traffic study or more specific information about the surrounding properties, such as a written BOA decision addressing the traffic concerns at those properties or the application from those neighboring properties. For example, Barn Hill could

---

[27] 877 A. 2d 54, 71 (Del. Ch. 2005).
[28] *Id.*

14

have gone to the Delaware Department of Transportation ("DelDOT") to perform a permitting or a traffic study on the effects of the proposed use. This Court does not require a traffic study to consider an application for a special use application. However, Delaware case law has allowed BOAs to rely on permitting agencies to perform their statutory duties to safeguard the public.[29] DelDOT is the appropriate agency to regulate traffic concerns and could have been contacted by Barn Hill in order to prove that the proposed use would not detrimentally effect traffic. However, Barn Hill has failed to provide sufficient evidence on this factor. Therefore, the BOA's determination must be upheld.

### D. No Rebuttable Presumption in Favor of Granting a Special Exception Arose Because Barn Hill Failed to Present Information Sufficient to Satisfy All Seven Requirements of LUDC.

As noted above Barn Hill has failed to present information sufficient for the BOA to conclude that the application has met all seven factors of LUDC section 140-116. Namely, Barn Hill has failed to provide information sufficient for the BOA to conclude that the proposed use will have no detrimental effect on traffic and not cause objectionable odor. Therefore, the rebuttable presumption language from *Gibson* does not apply to this application.

In *Gibson*, a rebuttable presumption arises when the applicant for a conditional use meets the statutory prerequisites for a conditional use.[30] But, the project must comport with the legislative standards in order for the rebuttable presumption to apply.[31] Furthermore, the Zoning Commission in Gibson had expressly found that the proposed conditional use will have no significant impact on traffic before the Sussex County Council determined that there would be a significant impact

---

[29] *Protect Our Indian River*, 2015 WL 4498971, at *14 (Del. Super. Ct. 2015) (citing *Dragon Run Terrace, Inc.*, 222 A. 2d 315, 318 (Del. 1966).
[30] *Gibson*, 877 A. 2d 54, at 64 (Del. Ch. 2005).
[31] *Id.* at 65.

15

on traffic.[32] The Court then held that vague and unsupported traffic concerns were not adequate grounds for the Sussex County Council to deny the application for a conditional use in light of the rebuttable presumption.[33] Here, no such finding was made by the Ocean View Zoning Commission. Also, as noted above, Barn Hill's application does not comport with the legislative standards set out in LUDC. LUDC specifically requires that an applicant for a special exception present evidence for the BOA to determine that the seven requirements listed in the statute have been met. Barn Hill has failed to present evidence to satisfy these seven criteria. Therefore, a rebuttable presumption does not apply and the BOA's decision must be upheld.

Barn Hill and the BOA briefed lengthy arguments concerning the case of *Board of Adjustment of Sussex County v. Verleysen*[34] and its application to the present case. These arguments were targeted at whether *Gibson* and its predecessor *Steen v. County Council of Sussex County*[35] apply to decisions from the BOA in Ocean View. Also, the litigants argue over whether a special exception and a conditional use are the same or different. This Court need not reach a conclusion on these issues because *Gibson* is distinguishable from the present factual situation as described above. Barn Hill has not met the legislative requirements set out in LUDC and the BOA relied on substantial evidence in deciding that Barn Hill had not met their burden.

## V.    CONCLUSION

This Court finds that the BOA's decision is supported by substantial evidence and is free from legal error. Accordingly, the decision of the BOA is AFFIRMED.

**IT IS SO ORDERED.**

---

[32] *Id.* at 71.
[33] *Id.* at 72.
[34] 36 A. 3d 326 (Del. 2012).
[35] 576 A. 2d 642 (Del. Ch. 1989).